**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,

  v.

                                      Case No.: 6:17-cr-187-ORL-37TBS

STEPHANIE LUNDE,

      Defendant.

_____

**<u>DEFENDANT STEPHANIE LUNDE'S MOTION TO DISMISS BASED ON
GOVERNMENT MISCONDUCT BEFORE THE GRAND JURY</u>**

The Defendant, STEPHANIE LUNDE, respectfully submits this Motion to Dismiss the Indictment based on Government misconduct before the Grand Jury.

On October 4, 2017, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), Ms. Lunde filed a Motion to Compel Production of a Transcript of Grand Jury Proceedings seeking the production of all testimony relating to the charges against Ms. Lunde and all instructions or responses to questions by the Prosecutor. *See* Doc. 146.   In response, the Government baldly asserted "[t]here was no inappropriate argument to the grand jury or the suggestion for unreasonable inferences to be drawn in response to any question from the grand jurors."   Doc. 166 at 4.   The Court subsequently ordered the Government to transcribe all the Grand Jury proceedings, review those transcripts "to determine whether [the Government] should provide any other portion of testimony," and file a certification of compliance by November 3, 2017. *See* Doc. 170.

On November 3, 2017, in response to the Court's order, the Government produced an additional three pages of Grand Jury transcript, which contradicted the Government's prior claim to the Court.[1]  *See* Doc. 182.

Based on the Grand Jury transcripts produced to date (including the recently produced portion of the transcript), the transcript reflects a pattern of serious misconduct before the Grand Jury including: (i) false and misleading testimony to the Grand Jury, (ii) improper testimony by the Prosecutor without evidence, and (iii) improper legal instructions to the Grand Jury.   The Government's pattern of substantial misconduct is so pervasive throughout the Grand Jury proceeding and present in responses to key Grand Juror's questions regarding the basis for a criminal charge against Ms. Lunde, so as to amount to an improper intrusion into the independent role of the Grand Jury and actual prejudice to Ms. Lunde's constitutional rights to a Grand Jury and Due Process.  Accordingly, the Indictment against Lunde must be dismissed.

## FACTS

The Government has charged Lunde with conspiracy to commit bank fraud and multiple counts of bank fraud.  *See* Indict. (Doc. 12).  In general, these charges are related to Lunde's work as an employee of related entities, the Marshall Group ("Marshall") and BankFirst.  *Id.* at ¶ 2.  BankFirst was involved with servicing the loan at issue (the "Grande Palisades Loan").  *See id.* at ¶¶ 8, 17.  The Grande Palisades Loan was a $228 million commercial loan to a real estate developer, Lake Austin Properties I, Ltd. ("Lake Austin"), for a massive condominium project in Florida from 2006-2009.  *See id.* at ¶¶ 6–9.  The Grande Palisades Loan was funded by approximately 68 different participant banks (the "Participants").  *Id.* at ¶ 8.  The Government's

---

[1]   Lunde still seeks to compel the production of any undisclosed Grand Jury testimony or instructions.  Pursuant to the Court's Order, Lunde is filing a separate response to the Government's certification.

bank fraud charges against Lunde center on the idea that she intentionally hid information from the Participants about the developer, Lake Austin.  *See id.* at ¶¶ 34–42, 46(u)–(bb).

1.     **The Government Misled The Grand Jury Regarding Lunde's Purported Financial Benefit.**

During the course of the Government's presentation, the Government elicited testimony regarding the co-Defendants' purported financial gains from the alleged scheme.  *See* Ex. 1 at 35–36, 51–52.[2]   In an attempt to establish the fraudulent intent of a bank employee, co-Defendant Eric Johnson, the Prosecutor asked Agent Bolte about Johnson's financial incentive from the Grand Palisades Loan closing proceeds:

> **PROSECUTOR:**     And about 400,000 of that then flowed to Eric Johnson as the loan underwriter?
>
> **THE WITNESS [Agent Bolte]:**     Correct.

*Id.* at 36.

Later, a Grand Juror returned to this testimony and asked about Ms. Lunde:

> **GRAND JUROR:**     I have a quick question.
>
> **PROSECUTOR:**     Yes.
>
> **GRAND JUROR:**     Going back.  So you said Eric Johnson knew about the commission payments right away he got $400,000 at the closing.  What did – you haven't – and I think Lunde is his boss.  What was her financial gain at the closing or what did she have to gain?
>
> **THE WITNESS:**     She was more in credit administration.  She wasn't necessarily his boss at the time.  He was Ms. Boerenko's supervisor.
>
> **GRAND JUROR:**     Okay.
>
> **THE WITNESS:**     And then at a later date Mrs. Lunde supervised Mrs. Boerenko because Mr. Johnson left.
>
> **GRAND JUROR:**     But she didn't receive any direct commission payment or bonus –

---

[2] The page numbers appear in the upper right hand corner of the transcript.

> **THE WITNESS:**      *Not near to the scale of what Mr. Johnson did.*
>
> **GRAND JUROR:**      Based on the scale.  Thank you.
>
> **THE WITNESS:**      I believe she had some type of bonus structure but nothing like Mr. Johnson's because she was at that time, I believe, in a different department.

*Id.* at 51 (emphasis added).   These statements were misleading and deceptive because the Government's evidence does not reflect that Lunde received any direct benefit from the closing of the Grand Palisade Loan.

 In response to Lunde's Motion to Compel, the Government purported to provide the basis for the testimony described above.   *See* Doc. 166 at 2–4, 9–10.   Specifically, the Government pointed to emails and a spreadsheet that indicated that Lunde received a salary, benefits, and a year-end bonus of $26,000, which was paid to her in January/February 2007.  The Government also argued that evidence shows that Lunde received commissions for 2006.

The Grande Palisades Loan did not close until April 27, 2007.  *See* Indict. at ¶ 46(v).  Any bonus or commission Lunde received for 2006 does not factually relate to the Grande Palisade Loan closing.  In short, the Government simply cannot contend that the 2006 bonus and commission evidence supports testimony suggesting that Lunde had a financial incentive to close the April 2007 Grand Palisades Loan.   The Government now acknowledges that "[t]hese documents did not connect the defendant's bonus and/or commission to the Lake Austin real estate development . . . ."  Doc. 166 at 4.

Nevertheless, the Government still claims it did not intentionally mislead the Grand Jury because "the agent noted that any such compensation for the defendant [Lunde] was less than what codefendant Johnson received."  Doc. 166 at 9–10.  This argument now ratifies the Agent's Grand Jury testimony.   At a minimum, the testimony contains a material omission, namely that the "something less" Lunde received as a result of closing the Grand Palisades Loan was $0.  For

the same reason the Prosecutor elicited testimony about the direct financial gain Johnson received, the Grand Jury sought to understand what Lunde gained as a result of the Grande Palisades Loan.  Lunde in fact received no gain, but Agent Bolte plainly implied that she did—with no evidence to support his claim.

2.      **The Government Misrepresented that Lunde Admitted to Hiding the "Recall" of the 2005 Financial Statements from the Participants.**

In further support of the Government's case against Lunde, Agent Bolte testified to the Grand Jury that Lunde hid the recall of Lake Austin's 2005 financial statements from the Participants.  *See* Ex. 1 at 48–50, 52–53, 58.  Specifically, the Government adduced the following testimony to support its allegations against Lunde:

> **PROSECUTOR:**      And what did Marshall BankFirst communicate to the participant banks when this 2005 situation came to light in late 2007?
>
> **THE WITNESS:**      They sent a participant update in, I believe it was March or April of 2008.  And it was – at that time there were issues with him not providing financials because part of the loan package was that he had to provide yearly audited financial statements within, I think it was 90 days of year end each year.  And at that time they still only had 2005, that's what the accounting firm was working on was the '06 financial statements.  And then obviously '07 would have been coming due.
>
> So part of the participant update was to explain part of that situation, their not being in compliance with the loan agreement, not having updated audited financials. And this was, if I remember correctly, probably a five or six page participant update describing the situation, and somewhere in there it was mentioned that they might be recalled.
>
> **PROSECUTOR:**      Not that –
>
> **THE WITNESS:**      Not that they have been.
>
> **PROSECUTOR:**      Right.
>
> **THE WITNESS:**      Or not that they are but that they might be recalled.

*Id.* at 52–53.  Agent Bolte later revisited this subject:

5

> **PROSECUTOR:**     And the - - we talked a little bit ago about a participant update memo that Stephanie Lunde sent out in March 2008 where she reported that Lake Austin's 2005 financials quote, unquote may potentially be recalled?
>
> **THE WITNESS:**     Yes.  That's what we were discussing earlier.
>
> **PROSECUTOR:**     Later that month she then admitted to a fellow BankFirst employee that they had not notified the participant banks that the 2005 financial statements had actually been recalled; is that right?
>
> **THE WITNESS:**     Yes.

*Id.* at 58.

This testimony served as the basis for two of the few allegations against Lunde in the Indictment.  First, the Indictment alleged that "On or about March 13, 2008, defendant Stephanie Lunde approved dissemination of a 'Participant Update Memo' to the participating financial institutions with the Lake Austin loan.  This Participant Update Memo falsely reported that Lake Austin's 2005 financials 'may be potentially recalled.'"  *See* Indict. at ¶ 46(x).  The very next allegation asserted the following:  "On or about March 25, 2008, defendant Stephanie Lunde communicated to a fellow BankFirst employee that they had not been notified participating financial institutions that Lake Austin's accounting firm had 'recalled' the audited 2005 financial statements."  *See* Indict. at ¶ 46(y).

Although the Government used a PowerPoint presentation to show the Grand Jurors the faces of the defendants, the transcript does not reflect that the Government showed the Grand Jurors either the March 25, 2008 Lunde email exchange or the Participant Update Memo.  Instead, the Government elicited testimony from the Agent characterizing the content of those written communications.  The Agent's testimony regarding both allegations is objectively false and misleading.

The March 25, 2008 Lunde email exchange reflects something very different than the Government's testimony. Lunde's co-worker, Julie Nielsen, asked Lunde if "we have ever notified participants that they [sic] old [accounting] firm 'recalled' the audited 2005 statements?" *See* Ex. 2 at 001.[3] **Lunde responded, "Not that I remember."** *Id.* Based on a plain reading of the email, Lunde clearly did not "admit" that BankFirst had not notified the Participants about the recalled financials, as Agent Bolte testified. Rather, she said she did not remember them being informed.

Moreover, the Agent's testimony regarding this email exchange again omits critical and material details. The email exchange began with a question from Nielsen to Lunde asking why there was a need to re-issue the 2005 financial statements. In response to the question, Lunde asked another co-worker, Cecelia Boerenko, to provide Nielsen with the answer because Lunde was "unsure as to how answer this question." *Id.* at 001–2. The full exchange reflects that Lunde did not have the relevant information, and contradicts the testimony and allegation that Lunde "admitted" to not informing the Participants about the 2005 financials. The Agent's selective testimony and mischaracterization of Lunde's email exchange reflects a blatant disregard for the actual contents of the email.[4]

This mischaracterization is even more critical because, contrary to Agent Bolte's testimony, ***the March 13, 2008 Participant Update Memo actually did inform the Participants that the 2005 financial statements had been "recalled",*** not that they "might be recalled" as he

---

[3] For all Exhibits that do not contain Grand Jury transcripts, the page numbers cited are the last three digits of the Bates numbers that appear in the lower right hand corner of the document. The Bates labeling has by added by counsel to the documents produced by the Government.

[4] This March 25, 2008 email and its specific contents were well known to the investigators. The email was the exclusive subject of a second interview of Nielsen by Bolte's co-agent, Jon Heydon, on April 15, 2015. Ex. 3.

7

testified.  In that Memo, the Participants were provided a copy of the February 22, 2008 letter from Lake Austin that notified BankFirst that Lake Austin's auditors "had proceeded to recall the 2005 accounts."  Ex. 4 at 006 (noting that a copy of Lake Austin's letter was available to the Participants on "Loan-Link," the online document system used by BankFirst to provide information to the Participants); Ex. 5 (Lake Austin's letter regarding the 2005 financials).  The Participant Update Memo itself also informed the Participants that Lake Austin's auditors had been terminated and that a new firm had been engaged for purposes of "reviewing and re-issuing audited financial statements for FY 2005, 2006, and 2007."  Ex. 4 005–6.  The Memo further included a table that plainly indicated that Lake Austin was not in compliance with its financial reporting requirements for 2005, 2006, and 2007.  *Id.* at 007.

Indeed, although entirely omitted from the Agent's testimony, not only were the Participants told about the financial statements, the Participant Update Memo required the Participants to vote on whether to allow Lake Austin until December 31, 2008 to produce re-issued financial statements.  *Id.* at 009.  The Participants subsequently agreed to give Lake Austin additional time to produce these financials and the Grande Palisades Loan Agreement was amended accordingly.  Ex. 6 (containing the executed amendment to the Loan Agreement). That First Amendment specifically stated that Marshall had been informed that Lake Austin's 2005 financials were "incorrect" and "erroneous" and gave Lake Austin until December 31, 2008 to submit new financials.  *Id.* at 002.  Far from concealing the 2005 financial statement recall, BankFirst notified the Participants and sought their guidance how to address the issue.

Thus, Agent Bolte falsely testified that Lunde intentionally hid the recall of the 2005 financial statements from the Participants and that Lunde admitted to hiding the issue.  The critical nature of these particular allegations to the Government's indictment of Ms. Lunde was

revealed by the Government on November 3, 2017 when, in response to this Court's October 19, 2017 order, it produced the Prosecutor's response to the Grand Juror's question as to why Ms. Lunde was guilty of a crime.  In his response, which is addressed more fully below, the Prosecutor made the following statement regarding Agent Bolte's testimony:

> You then have multiple times where stuff is coming to her about that and she's still not revealing it to the participants, and then it gets compounded when the 2005 financials get withdrawn in December of 2007.  It takes her three months to let the participant banks know about that, and then she doesn't event tell them the whole truth about it.  And then later she admits that well, no, we haven't told the participants the truth about it, . . .

Ex. 7 at 77.

This assertion reflects that the purported "hiding" of the 2005 financials is the Government's best evidence of Lunde's alleged knowing effort to conceal information from the Participants.  It was critically important that the Government chose not to present the actual evidence to the Grand Jury, but instead relied on its own characterizations of that evidence.

### 3.      The Government Misrepresented Marshall BankFirst's Financial Exposure to Lake Austin and the Grande Palisades Loan.

In a further effort to impart "motive" to Lunde and her employer, the Government repeatedly claimed that BankFirst and Marshall did not have financial exposure in the Grande Palisades Loan (i.e., they were not Participants) and structured that Loan to minimize their financial exposure to Lake Austin in general.  Ex. 1 at 35, 41–42, 71.  Take the following exchange:

> **PROSECUTOR:**      And when Marshall BankFirst participated this loan, how much exposure did they actually have on this 100 million-plus loan?
>
> **THE WITNESS [Agent Bolte]:**      They did not participate at all in the loan.
>
> **PROSECUTOR:**      Oh, so they weren't facing any sort of exposure or risk if the loan failed?

**THE WITNESS:**     No.  They only got the, I think it was a four and a half million dollar origination fee and servicing rights going forward, which would be monthly fees as well.

*Id.* at 35.

This testimony was important to the Grand Jury, and a Grand Juror later asked Agent Bolte why BankFirst "didn't participant [sic]" in the Grande Palisades Loan.  *Id.* at 71. Agent Bolte responded that "I can surmise but I can't say specifically."  When the Grand Juror asked, "They knew it wasn't on the up and up?" Bolte responded, "Right."  *Id.*

In fact, the Government's own evidence shows unequivocally that Marshall Bank, N.A. *did* participate in the Grande Palisades Loan.[5]  Initially, its exposure was one million dollars. Ex. 8 at 004.[6]  In the summer of 2008, when one Participant failed, Marshall Bank, N.A. even *increased* its exposure to more than $1.3 million to assist with covering the "gap" left by the failed bank.  Ex. 9 at 013 (showing Marshall Bank, N.A.'s share of Columbian Bank's position); Ex. 10 at 043 (Marshall Bank N.A.'s signature page agreeing to adopt a share of Columbian Bank's position).  Therefore, the Government's suggestion that "Marshall BankFirst" was not facing "any sort of exposure or risk" if the Grande Palisades Loan failed is again objectively and demonstrably false based on the Government's own evidence.[7]  *See* Ex. 1 at 35.

In addition, the Government's explicit implication to the Grand Jury that BankFirst's lack of participation in the Grande Palisades Loan was evidence of fraudulent intent is entirely

---

[5] Marshall Bank, N.A. and BankFirst were affiliated banks with common Marshall ownership.

[6] Exhibit 8 does not have contiguous pagination because only pages relevant to Marshall Bank's participation were included.

[7] Marshall Bank, N.A.'s participation in the Grand Palisades Loan was not only readily available based on a review of Lunde's email (which the Government purportedly did), it was known to the investigating agency, the FDIC, which later sold that interest to Beal Bank Nevada as the receiver for Marshall Bank, N.A.  Ex. 11 at 002.

unsupported by the evidence (and amounts to improper conjecture). *See id.* at 71.  A review of Lunde's emails reveals that in early 2007, the Board of BankFirst decided to cease its loan participation business in response to regulator concerns.  Ex. 12 at 003 (email dated Aug. 15, 2007 attaching a letter from the President of Marshall).[8]  This decision was ratified in an agreement with the Federal Reserve.[9]

The Government also told the Grand Jury that "Marshall BankFirst" structured the Grande Palisades Loan so that proceeds from that Loan would pay off another a related loan (the "Palisades Loan") that BankFirst had with the same development company.  Ex. 1 at 41–42.  Specifically, the Government claimed that the Grande Palisades Loan "took care of ***any exposure*** that Marshall BankFirst had" in the Palisades Loan (which funded a prior development project to the Grand Palisades project).  *Id.* at 42 (emphasis added).  Again, the Government's own evidence reveals that this too is false.  In fact, BankFirst had approximately $1.4 million in participation exposure to the Palisades Loan and maintained an outstanding loan balance after the Grand Palisades Loan closed.[10]  Ex. 13 (showing BankFirst's outstanding balance in the Palisades Loan as of Sept. 10, 2008).

---

[8] Lunde's email and the attached letter from the President of Marshall were produced as two separate documents by the Government, hence they bear two distinct Bates labels.  However, both are contained within Exhibit 12.  The page number cited is found in the lower right hand corner of the President's letter.

[9] The agreement between BankFirst and the Federal Reserve can be found at: https://www.federalreserve.gov/newsevents/pressreleases/files/enf20070808a1.pdf (last accessed on Nov. 9, 2017).

[10] Again, the investigating agency, the FDIC, was aware of the BankFirst's continued exposure in the Palisades Loan since as BankFirst's receiver, it sold the balance of that Loan to Beal Bank Nevada.  Ex. 14 (affidavit filed by Beal Bank in action to foreclose on Lake Austin attesting to acquisition of BankFirst's interest in the Palisades Loan).

In an effort to establish fraudulent intent, the Government went to great lengths before the Grand Jury to provide testimony regarding Marshall BankFirst's purported efforts to close the Grand Palisades Loan with no ongoing exposure to the developer/borrower. This testimony was false and misleading.

**4.      The Government Misled the Kansas Grand Jury to Believe that the Grande Palisades Loan Contributed to The Failure of a Kansas Participant.**

Early in the Grand Jury presentation, which occurred in the District of Kansas, Agent Bolte testified that one of the participating banks from Kansas, Columbian Bank & Trust, failed in August 2008. Ex. 1 at 19. Later, a Grand Juror asked whether Columbian Bank & Trust failed because of the Grande Palisades Loan or "other reasons." *Id.* at 68. In response, the Prosecutor interjected with a series of questions. Agent Bolte confirmed that Columbian Bank & Trust was involved with a number of risky ventures wherein it lost money. *See id.* The Prosecutor then asked Bolte if it was "hard to know exactly which one of these [risky ventures] led to its failure . . . ?" *Id.* Bolte responded, "Correct. It's a cumulative effect, I would say."

Columbian Bank failed as a financial institution in August of 2008 and went into FDIC receivership. Indict. at ¶ 19. The Government's evidence reveals that the Grande Palisades Loan was performing at the time and received a "100% pass" rating from the Shared National Credit Exam ("SNC Exam") in June 2008.[11] Ex. 15 (June 20, 2008 Participant Memo notifying Participants about the results of the earlier SNC Exam); Ex. 16 at 002 (the SNC Exam).

In addition, Agent Bolte personally interviewed one former employee of Columbian Bank on May 12, 2016. Ex. 17. That employee provided no information that substantiated

---

[11] Shared National Credit Exams are conducted by the Federal Reserve, in conjunction with other regulatory bodies like the FDIC. *See* https://www.federalreserve.gov/supervisionreg/snc.htm (last visited on November 9, 2017).

Agent Bolte's testimony before the Kansas Grand Jury that the Grand Palisades Loan contributed to the Kansas bank's failure.  *See id.*

Agent Bolte's testimony to the Kansas Grand Jury that the Grand Palisade Loan was part of the "cumulative effect" that contributed to the failure of Columbian Bank was false and without evidentiary support.

**5.      The Prosecutor Provided Improper Testimony and Erroneous Instructions of Law.**

At the end of Agent Bolte's testimony, one Grand Juror explicitly stated that he/she was struggling with Lunde's culpability.

> **GRAND JUROR:**   I'm trying to figure out, Stephanie Lunde, if she would have just, if she would have told, you know, there's something wrong with this loan, she would not be included in this indictment; is that correct?  I guess I'm trying to figure out where she broke the law and at what point she went the other way.
>
> **PROSECUTOR:**      I can address that a little bit later.

Ex. 1 at 72.

> Later in the transcript, the Prosecutor took up the inquiry.
>
> **PROSECUTOR:**      May Agent Bolte be excused then?  Okay.  Your question, since that's more of a legal question and not facts or evidence, that's why I'm happy to field that.  So do you want to –
>
> **GRAND JUROR:**   I'm just trying to figure out the legality, like where she [Lunde] went wrong and why she's even included.  *I mean, is it mostly because she kind of hid the fact that this loan was bad?*
>
> **PROSECUTOR:**      *I think you could put it in that – that would be a straightforward way of doing it.*  You know, the things that – there's –

Ex. 1 at 75 (emphasis added).

The Government initially did not produce a complete response to this inquiry and instead asserted "[t]here was no inappropriate argument" or "suggestion for unreasonable inferences."

Doc. 166 at 4.  In response to this Court's October 19, 2017 Order, on November 3, 2017, the

Government produced its 3-page response to that Grand Juror question:

> **PROSECUTOR:**     We've tried to really narrow the focus of this case to just some salient point*s, one of those having to do with the subordinated debt, marketing expenses, $30 million to get the equity.  And through the evidence it appears certainly that Eric Johnson, Cecelia Boerenko and Stephanie Lunde were aware of that, and without that happening then this loan doesn't get participated and it doesn't go through.*

> It's easy for Mr. Johnson to see what's involved there because he gets a check for $400,000 that flows to him because of his work on this project and so you can understand that.  We don't have something similar for Ms. Lunde, so I certainly understand that question being there, but she's working on the credit side and so – *and we really didn't get into this and we can have Agent Bolte give more explanation about this if you want, but part of how else Marshall Group brought money into the whole conglomerate, if you will, was by having these loans and they're charging their fee for doing this participant.*

> So while they set it up and they send it out to all these banks, they then are skimming a little bit, not using that word in a bad way, but they're skimming a little bit off for their work that they're doing.  And so there's money that's still coming into Marshall Bank for doing this, on top of the 4.5 million they got at the beginning for getting this going and so there's why would someone in Ms. Lunde's position do this?  I think that's a logical question to ask, and we don't have a specific answer to give, *but it's clear that she knew that this debt, subordinated debt, was a cover up, that it was done so that this equity could – could be in existence for the funds to go through and so she didn't reveal that.*

> You then have multiple times where stuff is coming to her about that and she's still not revealing it to the participants, and then it gets compounded when *the 2005 financials get withdrawn in December of 2007.  It takes her three months to let the participant banks know about that, and then she doesn't event tell them the whole truth about it.  And then later she admits that well, no, we haven't told the participants the truth about it, and it's only – and Agent Bolte doesn't go into this but it's only later as things are headed towards foreclosure where some of these smaller banks are kind of out doing their own digging and realizing that there's problems, that then leads to sort of a disruption or a rebellion among the, if we're going to use the parlance of a recent movie of, you know, the rebellion of these participant banks coming out against the Empire, I shouldn't use those terms but, you know, to do that about what's going on here.*

> So it's really, it's, I think it's multiple situations where she's failing to report information, and it may very well be that she reported stuff up her chain of command and they chose not to act.  We don't know that at this point in time, but

what we do know is that these are things she didn't reveal to the participant banks. *There's not e-mail traffic where she's arguing to her superiors that this needs to be revealed and her superiors are sending e-mails back saying no, we're not going to do that.* We're going to hide it. So at this point she's kind of at the top of the ladder that we have to identify.

Ex. 1 at 75; Ex. 7 at 76–78 (emphasis added).[12]

As set forth above, the Prosecutor reiterated the demonstrably false and misleading testimony about subjects like Lunde's purported admission that she concealed the recall of the 2005 financial statements as a critical piece of evidence against Lunde.

The Prosecutor also ignored black-letter law (and Department of Justice Grand Jury Practice prohibitions) by misstating Grand Jury testimony and testifying regarding purported evidence that was not before the Grand Jury in an effort to persuade the Grand Jury that Lunde was guilty of a bank fraud.

First, the Prosecutor asserted:

[W]e've tried to really narrow the focus of this case to just some salient points, one of those having to do with the subordinated debt, marketing expenses, $30 million to get the equity. And through the evidence it appears certainly that Eric Johnson, Cecelia Boerenko and Stephanie Lunde were aware of that, and without that happening then this loan doesn't get participated and it doesn't go through.

Ex. 7 at 76. The Prosecutor then repeated his claim:

. . . it's clear that she knew that this debt, subordinated debt, was a cover up, that it was done so that this equity could – could be in existence for the funds to go through and so she didn't reveal that.

---

[12] Lunde has sought a full transcript of all Grand Jury proceedings relating to the Indictment against her, including any comments or instructions of law by the Prosecutor. Doc. 146 at 8. In response, the Government has not produced any testimony before the Grand Jury other than what is attached as Exhibits 1 and 7. The Government does assert that the produced agent testimony was all of the evidence provided to the Grand Jury for its finding of probable cause. Doc. 166 at 4.

*Id.* at 77.   A review of the entire transcript reveals no support for this claim.   There is no testimony and no evidence that supports the Prosecutor's bald claim that Lunde knew the subordinated debt was a "cover up."

Second, although the Prosecutor even acknowledged that he had not adduced evidence regarding Marshall's fees for the Grande Palisades Loan, he suggested that those fees somehow created a financial motive for Lunde to engage in a fraud.   *See id.* at 76.   Again, there is no basis for this claim or the implication that Lunde gained from the Grand Palisades Loan.

Third, the Prosecutor testified regarding purported additional facts he admitted were not in evidence.   Specifically, the Prosecutor made the following claims:

> Agent Bolte doesn't go into this but it's only later as things are headed towards foreclosure where some of these smaller banks are kind of out doing their own digging and realizing that there's problems, that then leads to sort of a disruption or a rebellion among the, if we're going to use the parlance of a recent movie of, you know, the rebellion of these participant banks coming out against the Empire, *I shouldn't use those terms but, you know, to do that about what's going on here.*

*Id.* at 77–78 (emphasis added).   Again, this is plainly improper testimony by the Prosecutor designed to inflame and persuade the Grand Jury that there is evidence showing how Lunde was guilty of a crime, despite the fact that no such "evidence" was presented to the Grand Jury.

Fourth, the Prosecutor erroneously, and improperly, advised the Grand Jury that evidence that Lunde "hid" facts regarding the Grand Palisades Loan would be sufficient in itself to constitute a fraud.   Ex. 1 at 75 ("I think you could put it in that – that would be a straightforward way of doing it.").   Key elements of bank fraud are that the defendant "*knowingly*" executed or attempted to carry out a scheme designed to defraud a financial institution, or obtain money or assets from a financial institution by means of false or fraudulent pretenses and that the defendant "intended to defraud".   18 U.S.C. § 1344 (emphasis added); *see also United States v. Williams*, 390 F.3d 1319, 1324 (11th Cir. 2004) (holding that bank fraud requires proving that

"the defendant acted knowingly"); Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010.  Here, based on the transcript produced by the Government in response to this Court's Order, it appears that the Prosecutor failed to adequately address the intent requirement for committing a fraud and truncated the elements of the offense.  To indict Lunde, there had to be evidence that Lunde knowingly and intentionally engaged in a scheme to defraud the Participants and that she intended to defraud the Participants.  Even assuming that there was evidence that Lunde "hid the fact that this loan was bad"—no such evidence was presented to the Grand Jury, as described above—it was improper to instruct the Grand Jury that such evidence was sufficient.

**6.     The Government's Misconduct Before the Grand Jury is Part of a Broader Pattern.**

The Government's repeated misconduct before the Grand Jury is not an isolated incident, but instead is part of a broader pattern.  First, the Government repeatedly misrepresented Lunde's status within its investigation in an effort to get her to provide them with assistance and statements.  *See* Docs. 140, 173.  It then engaged in a pattern of misconduct before the Grand Jury in order to secure an Indictment against Lunde, as set forth above.  Although Lunde had fully and repeatedly cooperated with the Government's investigation (including hiking out of the Grand Canyon from a family vacation to assist the investigator), the Government chose not to notify her or her counsel that she was indicted.  Even after co-Defendants appeared in the case in February and March 2017, the Government still chose not to inform her of the charges.  Lunde only learned of the Indictment in May 2017 through rumors that her counsel had to substantiate by calling the Prosecutor.  The Government has never explained this delay.

Even after Lunde appeared voluntarily to answer the charges in May 2017, the Government violated two Court orders by withholding discovery from Lunde for months, including her own interview statements and the Grand Jury transcript.  *See* Doc. 128.  The

Government's only response for this delay was to suggest it *could* provide the Court with reasons, such as other responsibilities and technical issues. Doc. 147 at 4. Yet, it is now apparent that the Government provided counsel for co-Defendant Johnson with extensive discovery in March 2017. *See* Doc. 181.

## ARGUMENT

In order to prosecute a federal defendant charged with a felony, the Fifth Amendment to the United States Constitution requires an indictment by a grand jury. U.S. Const. amend. V; *see also* Fed. R. Crim. P. 7. The Fifth Amendment grand jury right is intended to serve "a vital function . . . as a check on prosecutorial power." *United States v. Cotton*, 535 U.S. 625, 634 (2002). The grand jury's historical purpose includes "both the determination whether there is probable cause to believe a crime has been committed and the protections of citizens against unfounded criminal prosecutions." *United States v. Calandra*, 414 U.S. 338, 343 (1974). Thus, the grand jury's function is "meant to be an independent check on the ability of the government to bring criminal charges against individuals." *In re U.S.*, 441 F.3d 44, 57 (1st Cir. 2006); *see also United States v. Suarez,* 263 F.3d 468, 481 (6th Cir. 2001) (noting that the grand jury is a "defendant's main protection against the bringing of unfounded charges"). Indeed, it "functions as a shield, standing between the accuser and the accused, protecting the individual citizen against oppressive and unfounded government prosecution." *Calandra*, 414 U.S. at 342–43; *see also Wood v. Georgia*, 370 U.S. 375, 390 (1962) ("Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution . . . [and] stand[s] between the accuser and the accused."); *Hale v. Henkel*, 201 U.S. 43, 59 (1906) (relating that the function of the grand jury "was not only to examine into the commission of crimes, but

to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony or was dictated by malice or ill will").

District courts may dismiss an indictment for prosecutorial misconduct before a grand jury where that misconduct prejudices the defendant. *United States v. Accetturo*, 858 F.2d 679, 681 (11th Cir. 1988); *United States v. Pendleton*, 447 F. App'x 978, 980 (11th Cir. 2011) ("If prosecutorial misconduct occurs in the context of a grand jury proceeding, the proper remedy is to dismiss the indictment."). Admittedly, dismissal is an "extreme" sanction that should be "infrequently utilized." *Accetturo*, 858 F.2d at 681. However, where prosecutorial errors and misconduct "'substantially influenced' the grand jury's decision to issue charges, or if grave doubt existed that the decision was free from such influence[,]" dismissal is warranted. *See Pendleton*, 447 F. App'x at 981 (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263 (1988)). "The cumulative effect of the many instances of misconduct can fairly be said to have substantially influenced the grand jury's decision to indict." *United States v. Breslin*, 916 F. Supp. 438, 446 (E.D. Pa. 1996) (quotations omitted).

Here, the Government usurped the Grand Jury's independence and improperly influenced its decision to indict in at least three ways. First, the Government repeatedly presented demonstrably false and misleading testimony while simultaneously failing to present considerable exculpatory evidence. Second, the Government put forward false and misleading testimony designed to inflame the Grand Jury's passions. Third, the Prosecutor improperly testified before the Grand Jury and provided them with erroneous legal instructions regarding what constitutes bank fraud. Moreover, the Government's misconduct was not limited to the Grand Jury proceedings, but rather has been endemic throughout this case. The cumulative effect of this misconduct influenced the Grand Jury's decision to indict, substantially prejudicing

Lunde in the process, and amounts to a violation of the Fifth Amendment's grand jury and due process guarantees.

## Use of False and Misleading Testimony

A grand jury cannot serve as a constitutionally mandated check on government over-reach if it is misled by the government. *See Bank of Nova Scotia*, 487 U.S. at 259 (holding that an infringement on the grand jury's independence "may result in grave doubt as to a violation's effect on the grand jury's decision to indict"). "A prosecutor may not mislead the grand jury or engage in fundamentally unfair tactics. Thus, a prosecutor may not employ testimony known to be perjurious, or withhold substantial evidence negating guilt." *United States v. Greer*, 178 F.R.D. 418, 428–29 (D. Vt. 1998). "[A] prosecutor may not deliberately mislead a grand jury or instill false impressions to it in an effort to obtain an indictment." *United States v. Red Elk*, 955 F. Supp. 1170, 1182 (D.S.D. 1997).

The Government's pattern of repeated false and unsubstantiated testimony before the Grand Jury substantially prejudiced Lunde by significantly influencing the Grand Jury's decision to indict. Notably, some of the most egregious instances of misconduct came in relation to Grand Jurors' questions that showed they were struggling to understand whether Lunde did anything wrong. *See* Ex. 1 at 51, 68–69. When asked by a Grand Juror whether Lunde received "any direct commission payment or bonus," Agent Bolte gave a false and misleading answer that implied Lunde received a commission on the Grande Palisades Loan, like co-Defendant Johnson albeit less than Johnson. This false and misleading testimony goes to the heart of whether Lunde had any motive to intentionally commit a fraud. In response to the Motion to Compel Production of the Grand Jury Transcript, the Government offered no evidence that Lunde received a "direct commission payment or bonus" related to the Grande Palisades Loan. It is important that the

Government has not argued that Agent Bolte mistakenly erred in his recollection of the evidence. Instead, the Government contends that the testimony was intentional and proper. Yet, the testimony is objectively misleading and omitted a material fact from the Grand Jury's deliberative process. This itself raises grave doubts about whether the Grand Jury's charging decision was uninfluenced by the Government's misrepresentations. *See Bank of Nova Scotia*, 487 U.S. at 259.

The false testimony did not end there. For instance, in an attempt to show Lunde's efforts at "hiding" material information from the Participants, the Government claimed that Lunde told Nielsen that the Participants were not informed about Lake Austin's "recalled" 2005 financials. Yet, the actual email exchange belies the Government's claims and reflects Lunde acknowledging that she was not aware of the details of the recall or whether the information had been disclosed. Second, the Participants *were in fact informed* and they voted to give Lake Austin until the end of 2008 to provide new audited financials.

Similarly, in an effort to impart "motive" for the alleged fraud to BankFirst, the Government claimed that "Marshall BankFirst" did not have any exposure in the Grande Palisades Loan and in fact used that loan to "eliminate" its exposure to Lake Austin in the separate Palisades Loan. Yet, the Government's own evidence revealed that the Marshall affiliate, Marshall Bank, N.A. was a Participant in the Grande Palisades Loan and even increased its participation in 2008. And, BankFirst had ongoing exposure in the Palisades Loan even after the Grande Palisades Loan closed. Indeed, those exposures to Lake Austin were readily apparent from the Government's evidence and were known to at least one of the investigating agencies, the FDIC, which sold the participations after taking over each of the banks.

In light of the Grand Jury's questions and the pervasive and repeated false testimony it received in response, the record before this Court leaves no doubt that the Indictment was a direct product of this false testimony.  The willful and wonton disregard of the actual contents of the Government's evidence, including the documents the Government cites to, reflects a pattern of disregard for the truth.  As such, the proper remedy is dismissal.  *See Pendleton*, 447 F. App'x at 981.

## Improper and Misleading Attempts to Inflame the Grand Jury's Passions

"Courts have also held that a prosecutor may not make statements or argue in a manner calculated to inflame the grand jury unfairly against an accused."  *United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983); *see United States v. Gold*, 470 F. Supp. 1336, 1346 (N.D. Ill. 1979) (holding that the government "cannot inflame or otherwise improperly influence grand jurors against any person").  Here, in a transparent effort in improperly inflame the passions of the Kansas Grand Jury, Agent Bolte implied that the failure of Columbian Bank & Trust (a local, Kansas bank) was due in part to the Grand Palisades Loan.  There is no evidence that the Grande Palisades Loan was part of the "cumulative effect" that led to Columbian Bank & Trust's closure.  Indeed, the available evidence contradicts this claim.

## Improper Prosecutorial Testimony

In addition to the false and misleading testimony by the Agent, the recent production of three additional pages of the transcript reveals that the Prosecutor committed his own misconduct before the Grand Jury by improperly: (i) testifying regarding purported evidence not presented to the Grand Jury, (ii) characterizing the evidence in a manner that was not supported by the actual testimony before the Grand Jury, and (iii) instructing the Grand Jury regarding what constitutes bank fraud.

A prosecutor cannot act as a witness before a grand jury, testifying to facts not in evidence or otherwise influencing the grand jury's independent review of the evidence. *See United States v. Wiseman*, 172 F.3d 1196, 1205–06 (10th Cir. 1999) *abrogated on other grounds by Rosemond v. United States*, 134 S. Ct. 1240 (2014); *United States v. Ogden*, 703 F.2d 629, 637 (1st Cir. 1983). In order for a grand jury's investigation to be independent, it must be free from the outside influences, including the influence of the prosecutor. *See United States v. Williams*, 504 U.S. 36, 49 (1992) ("[T]he Fifth Amendment's constitutional guarantee *presupposes* [a grand jury] acting independently of either prosecuting attorney *or judge*." (citations omitted) (emphasis original)); *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983) ("Prosecutors share with courts the duty not to interfere with the grand jury's function."). A prosecutor testifying to facts not in evidence, or otherwise attempting to influence the decision whether or not to indict, may adversely affect a grand jury's independence. *See Wiseman*, 172 F.3d at 1205; *United States v. Sigma Int'l, Inc.*, 244 F.3d 841, 869–74 (11th Cir. 2001), *reh'g en banc granted, opinion vacated*, 287 F.3d 1325 (11th Cir. 2002).[13]

At the beginning of grand jury proceedings, a prosecutor might "indicate" what kind of evidence a grand jury will hear without improperly influencing the grand jury's independence, so long as such evidence is later presented by a witness other than the prosecutor. *See Wiseman*, 172 F.3d at 1204–05 (noting that a prosecutor may not testify to a grand jury, but finding that the prosecutor in that case did not act improperly when he initially told a grand jury that a robbery

---

[13] The Eleventh Circuit agreed to re-hear the *Sigma* case en banc, vacating the prior panel opinion in the process. *United States v. Sigma Int'l, Inc.*, 287 F.3d 1325 (11th Cir. 2002). Before the en banc hearing was held, the parties entered into a plea agreement, mooting the appeal, and causing the Eleventh Circuit to vacate the opinion. *United States v. Sigma Int'l, Inc.*, 291 F.3d 765, 766 (11th Cir. 2002). However, the original *Sigma* panel decision, 244 F.3d 841, is still cited favorably in treatises. *See, e.g., Federal Grand Jury: A Guide to Law and Practice*, § 21:20. Other improprieties: prosecutor testified or expressed own opinion, 2 Fed. Grand Jury § 21:20 (2d ed.).

affected interstate commerce when the investigating agents later testified about the interstate nature of the business that was robbed).  However, a prosecutor may not: (1) invite the grand jury to indict based merely on the prosecutor's assurances that there is evidence to support the charges, (2) invite an indictment based primarily on the prosecutor's "summary" of evidence without that evidence actually being presented, or (3) suggest that the defendant committed other crimes or engaged in other "bad behavior" not charged in the proposed indictment.  *See Sigma Int'l*, 244 F.3d at 872–74.  Informal, unsworn testimony by a prosecutor "is generally disfavored because it has a tendency to unduly influence the grand jury."  *Id.* at 872 (citation omitted).  "An AUSA testifying informally and unsworn to a grand jury therefore has the potential of overbearing the grand jury."  *Id.* (noting that this practice is also prohibited by various rules of professional conduct).

As detailed above, in his attempt to answer a Grand Juror's question regarding how Lunde was culpable, the Prosecutor improperly mischaracterized the evidence before the Grand Jury, repeated false testimony, assured the Grand Jury there was additional evidence that had not been presented that revealed Lunde's alleged criminal conduct, and mis-instructed the Grand Jury to suggest that Lunde's purported "hiding" of facts from the Participants was sufficient to constitute bank fraud without informing the Grand Jury that it needed to find sufficient evidence to prove that Lunde knowingly participated in a scheme, that she intended to defraud the financial institutions, and that the information she "hid" was material.  This plainly and egregiously improper conduct occurred when the Grand Jury was struggling to understand how the evidence presented substantiated the allegation of bank fraud against Lunde.

Thus, the Government's improper conduct before the Grand Jury was so substantial and pervasive that there can be no doubt that the independent function of the Grand Jury was

impaired and the Indictment against Lunde was the direct product of this misconduct.   This

constitutes actual, substantial prejudice and warrants dismissal of the charges against Lunde.  *See*

*Greer*, 178 F.R.D. at 428–29; *Red Elk*, 955 F. Supp. at 1182.

**The Government's Pattern of Misconduct**

Finally, the Government's misconduct before the Grand Jury is fairly considered in the

context of its conduct throughout the investigation and these proceedings.   The Government's

misconduct has not been limited to just the Grand Jury proceeding.   At the outset of its

investigation, the Government targeted Lunde as a "potential target."   Nevertheless, the

Government concealed this fact from Lunde and her counsel and induced Lunde to give four

interviews over three years by repeatedly representing to Lunde and her counsel that Lunde was

not a "subject" or "target," but merely a "witness" who could help "fill in the gaps" of the

investigation.   Despite these numerous representations, it is now clear that the Government was

plainly investigating Lunde's conduct by at least May of 2013 if not from the outset (in

accordance with its designation as a "potential target").

After indicting Lunde in December 2016, the Government then ignored Lunde's speedy

trial rights and never informed Lunde or her counsel regarding the charges.   Instead, the

Government contacted co-Defendant Eric Johnson and in March 2017 provided him with

substantial discovery, presumably in an effort to obtain his cooperation.   Even after Lunde finally

learned of the Indictment and voluntarily appeared in May 2017, the Government failed to

produce Rule 16 discovery for months, violating her Speedy Trial rights and two separate Court

scheduling orders.

The cumulative effect of the Government's misconduct before the Grand Jury alone

warrants dismissing the charges against Lunde.  *See Breslin*, 916 F. Supp. at 446.   When this

misconduct is considered in light of the Government's pattern of misconduct throughout the investigation and prosecution of this case, it evidences the sort of outrageous prosecutorial misconduct that justifies dismissal. *See United States v. Haile*, 685 F.3d 1211, 1221 (11th Cir. 2012) ("A court may remedy outrageous government conduct by dismissing an indictment . . . .").

Any of this conduct taken alone is deeply troubling, but when considered in totality, it reflects a wonton disregard for Due Process as required by the Constitution and concepts of fundamental fairness. Therefore, Defendant Lunde respectfully requests that this Court grant her Motion and dismiss the charges against her.

## CERTIFICATION OF CONSULTATION

Pursuant to the Local Rules of the Middle District of Florida, on November 10, 2017, counsel consulted with United States Special Attorney Scott Rask and provided him a copy of the Motion and exhibits prior to filing. Mr. Rask indicates that the Government opposes this motion.

Date:  November 27, 2017

Respectfully Submitted:

**/s/ Joseph T. Dixon, III**
**Joseph T. Dixon, III**
**Minnesota Bar No. 0283903**
**Alexander D. Chiquoine**
**Minnesota Bar No. 0396420**
**FREDRIKSON & BYRON, P.A.**
**200 South Sixth Street, Suite 4000**
**Minneapolis, MN  55402-1425**
**Telephone:  612.492.7000**
**Facsimile:  612.492.7077**
*Admitted Pro Hac Vice*

**-and-**

/s/ Fritz Scheller
**FRITZ J. SCHELLER**
**Florida Bar Number 183113**
**Fritz Scheller, P.L.**
**200 East Robinson St., Suite 1150**
**Orlando, Florida 32801**
**Telephone: 407-792-1285**
**Facsimile:  407-513-4146**
**Email: fscheller@flusalaw.com**

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that, on November 27, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>/s/ Joseph T. Dixon, III</u>
**Joseph T. Dixon, III**
**Minnesota Bar No. 0283903**
**Alexander D. Chiquoine**
**Minnesota Bar No. 0396420**
**FREDRIKSON & BYRON, P.A.**
**200 South Sixth Street, Suite 4000**
**Minneapolis, MN  55402-1425**
**Telephone:  612.492.7000**
**Facsimile:  612.492.7077**
*Admitted Pro Hac Vice*